IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 7, 2019

**DONTAVIOUS HENDRIX v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Madison County**
**No. C-17-265     Donald H. Allen, Judge**

_____

**No. W2019-00171-CCA-R3-PC**

_____

The Petitioner, Dontavious Hendrix, was convicted of second-degree murder and subsequently sentenced to twenty-five years. See Tenn. Code Ann. § 39-13-210(a)(1). Following denial of his direct appeal, the Petitioner filed a petition seeking post-conviction relief, alleging that trial counsel was ineffective based on the following grounds: (1) implementing an inappropriate trial strategy by allowing Monderrius Miller to testify on behalf of the defense; (2) failing to properly advise the Petitioner of his right to testify on his own behalf; and (3) failing to interview potential witnesses. Following our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE, and ROBERT W. WEDEMEYER, JJ., joined.

Kortney D. Simmons, Jackson, Tennessee, for the appellant, Dontavious Hendrix.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Alfred Lynn Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**TRIAL**

Following a jury trial, the Petitioner was convicted of one count of second-degree murder and sentenced to twenty-five years in confinement to be served at one-hundred percent. See State v. Dontavious Hendrix, No. W2015-01671-CCA-R3-CD, 2016 WL

3922939, at *1 (Tenn. Crim. App. July 15, 2016), perm. app. denied (Tenn. Nov. 22, 2016).  As relevant to the issues raised in this appeal, the facts as outlined in our opinion affirming the Petitioner's conviction on direct appeal provide as follows:

Brenda Sheffield, the victim's aunt, testified that the victim, Justin Williams, arrived at her house in Jackson, Tennessee, at approximately 1:00 p.m. on July 27, 2014.  He was sitting on her front porch when a red Nissan Altima pulled into a neighbor's driveway, and the victim walked over to meet the two men that got out.  Sheffield identified one of the men as the [Petitioner].  The three men stood talking for a few minutes.  The conversation did not appear to be confrontational, and no one was yelling.  She then went back inside and, a short time later, heard three gunshots.  She ran to the door and watched as the [Petitioner], holding a gun, and another man, whom she identified as Monderrius Miller, ran back to the Altima.  The victim collapsed on the front porch.  Sheffield chased the Altima in her car as it fled the scene until she saw the police.  She testified that she never saw the victim with a gun and did not know the victim to carry a gun.

On cross-examination, Sheffield confirmed that she never saw the victim with a gun and did not hear anyone mention that he had a gun on July 27, 2014, but stated that she had heard later "through the streets" that the victim might have had a gun.  She also confirmed that she did not observe any confrontation between the three men and that "[the Petitioner and Mr. Miller] jumped out of the car like they [were] cool."  She admitted that she might have seen the [Petitioner] and Miller before but insisted that she did not know them personally.  She estimated that it was approximately three minutes from when she first saw the Altima to when she heard the shots.  She was unable to describe the color or shape of the gun that the [Petitioner] was holding.  On re-direct examination she clarified that no one at the crime scene told her that the victim had a gun, but that she had heard the rumor later.

Keyandra Cole, Brenda Sheffield's daughter and the victim's cousin, testified that she was at home when the victim arrived at their house on July 27, 2014.  A short time after the victim arrived, a red Nissan Altima pulled up and the victim walked over and began talking to the driver.  Cole testified that she could not hear what the men were saying but described the conversation as "serious."  She then went to change clothes and, as she made her way downstairs, heard three gunshots.  She ran outside and saw the victim collapsed on the front porch with an apparent gunshot wound and two men, whom she identified as the [Petitioner] and

Monderrius Miller, getting into the red Altima. She testified that she never saw the victim with a gun, did not see a gun on the scene, and did not hear anyone on the scene saying that the victim had a gun. On cross-examination, Cole stated that she and the victim had a close relationship and that he was "like [her] big brother." She also clarified that another individual, Jeremy Echols, known to her as "Gutter," arrived at the house and spoke to the victim, but left before the Altima pulled up. She never saw the victim raise his arms or use an angry tone that day but believed his conversation with the driver of the red Altima was serious, "Because when my cousin talked to someone, it was always serious."

Alexandria Holmes, who was in a relationship with the [Petitioner] at the time of the offense, testified that she allowed him to use her car, a red Nissan Altima, on July 27, 2014. She recalled that he dropped her off at work on July 26, 2014, and that Monderrius Miller and his girlfriend returned the car to her at approximately 2:00 p.m. the following day. She did not think it was strange that Miller returned the car to her and she testified that he and the [Petitioner] drove her car "all the time."

Officer Ted Maxwell of the Jackson Police Department was the first officer on the scene and estimated that there were between five and seven people present when he arrived. He recalled that the victim was suffering from an apparent gunshot wound when he arrived and was being comforted by a man on the front porch of the house. On cross-examination, he testified that he was dispatched to the scene between 1:25 and 1:30 p.m. and arrived within two minutes. He affirmed that he did not locate any weapons at the scene. Officer Rochelle Staten arrived shortly after Officer Maxwell and observed that the victim had a gunshot wound to the stomach. Officer Staten located three shell casings in the driveway near the victim, which she collected as evidence, but did not find a gun. She also took several photographs depicting the location of the shell casings and the witnesses on the scene when she arrived. Sergeant Steven Story testified that the victim had been loaded into an ambulance by the time he arrived and that he travelled to the hospital and photographed the victim's wounds. The photographs, which were introduced into evidence at trial, showed gunshot wounds to the victim's right and left thigh along with corresponding exit wounds, as well as a gunshot wound in the victim's abdomen. On cross-examination, Sgt. Story testified that he also collected the victim's personal effects from the hospital and that among those items were three broken pills which he believed to be Xanax.

Dr. Erin Carney, an expert in the field of forensic pathology, testified that she performed the autopsy on the victim. She stated that the victim suffered from three gunshot wounds, one to each thigh and one to the abdomen, and she was able to recover the bullet that struck the victim in the abdomen. Dr. Carney opined that the cause of death was multiple gunshot wounds and the manner of death was homicide. On cross-examination, Dr. Carney affirmed that there were no gunshot wounds to the upper torso or head of the victim and noted that the victim had Xanax and "a couple metabolites of marijuana" in his system when he died.

Dr. Eric Warren, a special forensic scientist with the Tennessee Bureau of Investigation (TBI) and an expert in the field of ballistic identification and analysis, examined the bullet recovered from the victim's abdomen and the three shell casings recovered from the scene. According to his examination, all three casings were fired from a nine-millimeter Smith and Wesson handgun. Dr. Warren explained that the bullet was also a nine-millimeter, but he was unable to match it to any of the shell casings. However, he determined that it could have been fired from one of three manufacturers, including Smith and Wesson, and that it was possible that the shell casings and bullet had all come from the same gun.

Investigator Aubrey Richardson, the lead investigator in the case, testified that he received a tip that the [Petitioner] and Monderrius Miller were involved in the shooting. He put together separate photo lineups for both suspects that showed their faces along with the faces of five other individuals. Investigator Richardson showed the lineups to Brenda Sheffield on the day of the shooting, and she identified the [Petitioner] as the man with the gun. Investigator Richardson then obtained an arrest warrant and put out a "be on the lookout" (BOLO) for the [Petitioner]. In September of 2014, the [Petitioner] was apprehended by the United States Marshals Service in Indianapolis, Indiana, and Investigator Richardson picked him up on September 10, 2014.

Monderrius Miller testified on behalf of the defense and admitted that he was with the [Petitioner] on the day of the shooting. Miller had known the [Petitioner] and the victim for "years" and was not aware of any ill will between them. He recalled that on July 27, 2014, he and the [Petitioner] stopped to talk to the victim after visiting a friend in the same neighborhood. The [Petitioner] got out of the car to talk to the victim, but Miller remained in the passenger seat. Although he could not hear the conversation, it appeared casual. At one point, the victim went into the

-4-

house and when he came back out Miller noticed a gun in his back-right pocket. Miller estimated that the two continued to talk for ten to twenty minutes. At some point in the conversation, Miller saw the victim "reaching and pulling the gun up." The [Petitioner] then drew his own gun and shot the victim. The [Petitioner] then got back in the car, and the two fled the scene. Miller was arrested the following day on September 27, 2014, and gave a statement to police after he was charged with the victim's murder. Ultimately, he was not indicted in the case.

On cross-examination, Miller explained that he did not call the police because he "didn't know what to do," and that he and the [Petitioner] never discussed the shooting in the car because they were both in shock. Miller also admitted that his testimony at trial varied from the account he gave to the police in his statement. Notably, his statement reflected that the victim was backing up and reaching for his gun when he was shot by the [Petitioner], but he did not state that the victim ever pointed a gun at the [Petitioner]. He attributed these inconsistencies to still being in shock. Miller also claimed that he never reviewed his statement after he initially gave it to police but agreed that he initialed it in two places and signed it at the end.

Hendrix, 2016 WL 3922939, at *1 ("Defendant-Appellant" altered to "Petitioner" throughout).

**POST CONVICTION HEARING**

On October 10, 2017, the Petitioner filed a pro se petition seeking post-conviction relief. In the petition, the Petitioner alleged that he received ineffective assistance in the following ways: (1) trial counsel failed to argue a self-defense theory and the lesser-included offense of voluntary manslaughter; (2) trial counsel failed to challenge inconsistent testimony from Brenda Sheffield and Keyandra Cole; (3) trial counsel failed to investigate potential witnesses; (4) trial counsel failed to challenge the victim's autopsy report; (5) trial counsel discouraged the Petitioner from testifying at trial; and (6) trial counsel failed to counteroffer a fifteen-year guilty plea agreement after receiving a twenty-year plea offer from the State. The post-conviction court held an evidentiary hearing on October 1, 2018.

At the post-conviction hearing, upon being asked about the ineffective self-defense argument, the Petitioner testified that he "felt like [trial counsel] didn't argue when Mr. Miller [] told the Court[] and the jury that the [victim's] family removed the

handgun" from the victim at the scene. The Petitioner stated that on the day in question, the victim exited his house with a gun in his right pocket. After exiting the house with the gun, the victim and Mr. Miller continued to talk and "from there everything went sideways." The Petitioner testified that the victim was "full of pills and drinking syrup." When the victim began drawing his weapon, the Petitioner fired his "weapon three times at [the victim,] and [the Petitioner] hit [the victim] where [the victim's] weapon was level with [the victim's] body." The Petitioner confirmed that he fired at the victim because he thought the victim was going to fire at him. The Petitioner did not explain to trial counsel that he wanted to argue self-defense, nor did he ask counsel any questions pertaining to self-defense.

At trial, the State called Brenda Sheffield to testify first and subsequently called her daughter, Keyandra Cole. The Petitioner explained that trial counsel did not know who Ms. Cole was. The Petitioner testified that he had never seen Ms. Cole's name in any of the discovery documents, nor had she ever given a statement.

Upon questioning about his claim of ineffective assistance for failure to investigate witnesses, specifically Frederick Williams, Tavis Hogsett, and Jamica Jackson, the Petitioner agreed that none of these individuals were witnesses to the shooting. The Petitioner continued that he "heard from a friend that Mr. Hogsett. . . took the gun off of [the victim] before the police got there." Additionally, the Petitioner spoke with Mr. Hogsett. The Petitioner confirmed that he told trial counsel about the victim's gun. The Petitioner informed trial counsel that he should speak to Mr. Williams and Mr. Hogsett regarding the victim's gun, but trial counsel responded that "[Mr. Williams and Mr. Hogsett] didn't mention a gun so it would be pointless for [trial counsel] to talk to them."

The Petitioner testified that his claim regarding trial counsel's failure to challenge the autopsy report was based upon his personal experience with "tak[ing] Xanaxs and drink[ing] syrup, promethazine as well." These substances would make the Petitioner "aggressive and give [him] an attitude and if somebody [said] anything to [him, he] would take it the wrong way[.]" The Petitioner testified that upon pulling up to the victim's house, the victim "was out there drinking syrup and popping pills." The Petitioner acknowledged though, that the toxicology report performed at the time of the autopsy did not reflect that the victim had those substances in his system. The Petitioner "felt like [trial counsel] should. . . have questioned the medical examiner on what effects do the drugs. . . give a person in that state of mind."

When questioned about trial counsel's discouraging the Petitioner from testifying at trial, the Petitioner explained that he had decided to testify, but trial counsel assured the Petitioner that Mr. Miller's testimony "was enough because [Mr. Miller could] put

two weapons on the scene." The Petitioner continued, however, that he did not initially plan to testify and that it was only after Ms. Sheffield and Ms. Cole gave inconsistent testimonies that he decided he wanted to take the stand. Additionally, the Petitioner "asked [trial counsel] not to call Mr. Miller [] to testify, but [trial counsel] said it was in [the Petitioner's] best interest" for Mr. Miller to testify because he was the Petitioner's "defense and he [could] put two weapons on the scene."

Upon being asked why he did not ultimately testify at trial, the Petitioner responded "[b]ecause [trial counsel] told me that. . . Mr. Miller already got up here and. . . [his] words. . . [weren't] going to mean [any]thing." The Petitioner agreed that the decision whether to testify was solely his to make. He confirmed that based upon trial counsel's advice it was best for him not to testify. The Petitioner testified that he and trial counsel had discussed calling Mr. Miller as a witness prior to trial, but "Mr. Miller [was] also the only person to label [him] as the shooter" at trial.

On cross-examination, the Petitioner testified that he wanted to take a fifteen-year plea offer. The Petitioner agreed that trial counsel had negotiated a twenty-year plea agreement, but he did not want to take the offer. After a discussion, the Petitioner told trial counsel that he would "rather go to trial and get the extra five years and try to appeal it." The Petitioner admitted that he never considered taking the twenty-year plea offer and that he believed the State had enough evidence to justify his possible acceptance of a fifteen-year plea offer, but not enough to justify his possible acceptance of a twenty-year plea offer.

The Petitioner agreed that even though he had not wanted Mr. Miller to testify in his defense, the Petitioner still would not have testified. Additionally, the Petitioner recalled the trial judge's informing him of his right to testify. The Petitioner "didn't want Mr. Miller to testify because [trial counsel] told [the Petitioner] that [trial counsel] had the State witnesses" because their witnesses "had two different testimonies[.]"

Upon being asked about the autopsy report, the Petitioner testified that he was unsure why illegal substances "didn't show up in [the victim's] autopsy," but he affirmed that the victim "was drinking syrup when [the Petitioner and Mr. Miller] pulled up."

On redirect-examination, the Petitioner confirmed that he was not aware of any counteroffer made by trial counsel after receiving the twenty-year guilty plea offer. The Petitioner reiterated that he would have taken a fifteen-year offer, but not a twenty-year offer. However, the Petitioner never asked trial counsel to make a counteroffer. The Petitioner did discuss with trial counsel a lesser charge of manslaughter, but trial counsel never explained the sentencing range for that charge.

Trial counsel testified that he was appointed by the court to the Petitioner's case. Upon being asked about interviewing individuals whose names appeared in the Petitioner's indictment, trial counsel recalled reviewing written statements that had been obtained through discovery. Trial counsel relied on written statements instead of interviewing the individuals in person. Trial counsel did recall interviewing one witness who was incarcerated at the time, but he could not remember which specific individual that was. He did remember that the statement obtained from this interview was "no different from the [written] statement [the individual] had given." Trial counsel additionally interviewed Mr. Miller. When asked about interviewing Ms. Sheffield, trial counsel could not remember if he interviewed her in person, but he did recall reviewing her written statement. Trial counsel did not interview Ms. Cole. Trial counsel confirmed that he would "have discussed with the Petitioner "all of the witnesses that the State intended to call" at trial. Trial counsel recalled the Petitioner's speaking to Mr. Hogsett after the incident.

Trial counsel discussed the plea offer of twenty years "a number of times" with the Petitioner. Trial counsel made counteroffers to the State "a number of times," and on the day of trial, the State offered an eighteen-year plea agreement. This counteroffer was relayed to the Petitioner who "was adamant that he was not going to plea[d] guilty."

Trial counsel called Mr. Miller to testify on behalf of the defense because his testimony was "that [the victim] had a weapon and that [the Petitioner] drew his weapon in response to it." Additionally, the Petitioner requested that Mr. Miller be called to testify. Trial counsel requested that Mr. Miller be transported from custody to trial in order to testify and the trial court agreed. Trial counsel met with the Petitioner and Mr. Miller the day before trial to discuss Mr. Miller's testimony. Trial counsel intended Mr. Miller's testimony to establish that the victim had a gun.

Trial counsel agreed that Ms. Sheffield's and Ms. Cole's testimony had "some discrepancies," but the overarching story was the same. Trial counsel believed Mr. Miller's testimony was necessary. Trial counsel believed the State's circumstantial evidence was enough to convict the Petitioner of second-degree murder.

Trial counsel and the Petitioner met "at least six times prior to trial," and the two "communicated well." Before calling Mr. Miller to the stand, trial counsel spoke with the Petitioner to ensure the Petitioner still wanted to call Mr. Miller as a witness. Trial counsel spoke with the Petitioner about self-defense and requested that self-defense be included in the jury instructions.

Trial counsel testified that the Petitioner never indicated that he wanted to testify in his own defense. At the conclusion of the State's proof, trial counsel and the Petitioner

-8-

once again spoke about the Petitioner's testifying. Mr. Howell stated that he "[did not] know that [the Petitioner] would have made the best witness and [that the Petitioner] would have to deal with the fact that [he] fled the state."

After reviewing the transcript from the preliminary hearing, trial counsel testified that Ms. Sheffield's testimony was nearly the same, with "some discrepancies here and there[.]" Concerning the autopsy report, trial counsel thought the Petitioner discussed that the victim was under the influence or intoxicated on the morning of the incident, but they did not discuss having a second autopsy performed, nor did the Petitioner ever express his desire to attack the accuracy of the autopsy report.

On cross-examination, trial counsel testified that he had been practicing for eighteen years and seventy to seventy-five percent of his cases were criminal cases. Trial counsel had handled "at least a thousand or more" criminal cases in his career. Upon being appointed, trial counsel obtained the discovery materials and shared them with the Petitioner. Trial counsel reviewed the indictment, written witness statements, police reports, autopsy reports, and transcripts.

Trial counsel testified that nothing was introduced at trial that surprised him. He opined that the discrepancies in Ms. Sheffield's and Ms. Cole's testimonies were inconsequential. Trial counsel's motion for a directed verdict at the conclusion of the State's proof was denied. He and the Petitioner spoke once again about the decision to testify after the trial judge conducted a <u>Momon</u> hearing. The Petitioner chose not to testify.

Trial counsel agreed that he had no reason to doubt the accuracy of the autopsy report. He agreed that the Petitioner's testimony would have been inconsistent with the actual autopsy report. Trial counsel confirmed that the Petitioner fled the state after the incident, disposed of the weapon, and gave a statement after being arrested out of state.

On redirect examination, trial counsel did not recall a recording between the Petitioner and Mr. Hogsett regarding a potential witness's knowledge about the victim's gun being moved after the shooting. Trial counsel confirmed that had he known "any information other than Mr. Miller, any witness that could have put a gun there, [trial counsel] would have made sure that witness appeared in court."

In an order filed on December 5, 2018,[1] the post-conviction court found that trial counsel was not ineffective. Relative to the Petitioner's argument that trial counsel was

---

[1] In it's order, the trial court specifically incorporated and attached a letter sent to the State and post-conviction counsel setting out its findings of fact and conclusions of law.

ineffective in arguing self-defense, the court relied on Mr. Miller's testimony that the Petitioner shot the victim after the victim pulled the gun out. Additionally, the court noted that the Petitioner requested trial counsel to call Mr. Miller as a defense witness to testify "on behalf of [the Petitioner's] plea of self-defense."

Relative to the Petitioner's claim that trial counsel discouraged him from testifying, the post-conviction court noted that the Petitioner freely and voluntarily waived his right to testify at trial. The court discredited the Petitioner's testimony that trial counsel discouraged him from testifying on his own behalf and found that the Petitioner "didn't want to testify."

Finally, the post-conviction court credited trial counsel's testimony that he met with the Petitioner six times prior to trial and developed a trial strategy. The court found trial counsel's services to be within the range of competence and that the Petitioner failed to show trial counsel's performance was deficient or resulted in prejudice to the Petitioner. The court denied relief on the Petitioner's petition by way of written order filed on December 5, 2018.

The Petitioner timely filed a notice of appeal. The case is now before us for review.

**ANALYSIS**

On appeal, the Petitioner presents three of the issues raised at his post-conviction hearing and submits that the post-conviction court erred when it denied him relief.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

-10-

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

I. **Inappropriate calling of a witness**

First, the Petitioner contends that trial counsel was ineffective because in spite of trial counsel's testimony that the State's proof was wholly circumstantial, counsel went against the Petitioner's wishes and called Mr. Miller as a witness. The State responds that the Petitioner is precluded from arguing this point because he failed to raise it in his petition for post-conviction relief. Although the Petitioner did fail to raise this specific argument in his petition, we will address the claim on its merits because both the Petitioner and trial counsel gave testimony regarding the issue, the State did not object to the testimony, and the post-conviction court made findings on the issue.

At the post-conviction hearing, the Petitioner testified that Ms. Sheffield's and Ms. Cole's testimony at trial did not name the Petitioner as the shooter and that Mr. Miller was the only witness to identify the Petitioner as the shooter. The Petitioner continued that he asked trial counsel not to call Mr. Miller to testify, but relied on trial counsel's advice that it "was in [his] best interest that Mr. Miller [testify because]. . . [Mr. Miller could] put two weapons on the scene."

Trial counsel testified that he and the Petitioner had discussed the theory of self-defense at length before trial, meeting at least six times. Trial counsel and the Petitioner agreed that Mr. Miller's testimony was necessary to place a weapon on the victim at the time of the incident, as neither Ms. Sheffield nor Ms. Cole testified that the victim had a gun. The Petitioner had asked that Mr. Miller be transported to court in order to testify on his behalf. Additionally, on the day before trial, trial counsel spoke to the Petitioner and Mr. Miller about Mr. Miller's testimony. At the conclusion of the State's proof, trial counsel once again made sure that the Petitioner wanted Mr. Miller to testify. The Petitioner agreed.

We glean from the post-conviction court's order that the post-conviction court credited trial counsel's testimony regarding the decision to have Mr. Miller testify in support of a self-defense argument. The post-conviction court found that the Petitioner requested that trial counsel call Mr. Miller for his defense, and the Petitioner has not proven by clear and convincing evidence that he did not want Mr. Miller to be called. We conclude that trial counsel was not deficient in his decision to call Mr. Miller to testify, therefore, there is no need for us to discuss prejudice.

## II. Right to testify

Second, the Petitioner contends that he did not freely and voluntarily waive his right to testify because he "relied on the advice of counsel to his detriment[.]" The State responds that Petitioner is precluded from raising this argument as "he made no such claim in his petition for post-conviction relief." However, the Petitioner set out in his Petition for Relief for Post-Conviction Relief that "[i]t was [trial counsel] who made [the

decision] for the Petitioner not to testify." Additionally, the State argues that the trial court's findings did not credit Petitioner's testimony that he was discouraged by trial counsel from testifying.

A defendant has a constitutional right, under both federal and state law, to testify on his behalf at trial. Momon v. State, 18 S.W.3d 152, at 157 (Tenn. 1999). Because the right to testify is a fundamental right, the right must be personally waived by a defendant. Id. at 161.

"Defense counsel is not required to engage in any particular litany, but counsel must show at a minimum that the defendant knows and understands that:

(1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;

(2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;

(3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify." Id. at 162.

The Petitioner testified that he had decided not to testify before trial. He then recanted and stated that he wanted to testify on the day of trial. On cross-examination, the Petitioner again recanted and testified that he would not have testified and would have presented no evidence at the close of the State's case. The Petitioner agreed that he understood the decision to testify was within his sole discretion. The Petitioner recalled the trial court's telling him it was his decision whether to testify and that no one could force him not to testify. The Petitioner chose not to testify.

Trial counsel asserted that the Petitioner "never indicated to [trial counsel] that he wished to testify[.]" Trial counsel continued that he spoke with the Petitioner at the close of his defense about whether he wanted to testify on his own behalf, and the Petitioner did not want to testify. Trial counsel stated that he did not know "that [the Petitioner] would have made the best witness and [the Petitioner] would have to deal with the fact the [the Petitioner had] fled the state."

The trial court discredited the Petitioner's testimony that trial counsel discouraged him from testifying. We agree and conclude that trial counsel was not deficient; therefore, we need not address the prejudice prong of Strickland.

## III.    Failing to interview all potential witnesses

Third, the Petitioner contends that trial counsel was ineffective by failing to interview three individuals: Tavis Hogsett, Frederick Williams, and Jamica Jackson.  The Petitioner argues that he "requested" these individuals be interviewed and that "Mr. Hogsett had admitted that [the victim's family] took the gun off the victim prior to police arriving."  The State responds that the Petitioner cannot establish prejudice because he failed to call the potential witnesses at the evidentiary hearing.

When a petitioner contends trial counsel failed to discover, interview, or present witnesses in support of his defense, the petitioner must call those witnesses to testify at an evidentiary hearing.  Black v. Black, 794 S.W.2d 752 at 757 (Tenn. Crim. App. 1990). This is the only way the petitioner can establish that:

> (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of petitioner.

Id.  Even if a petitioner is able to show counsel was deficient in the investigation of the facts or the calling of a known witness, the petitioner is not entitled to post-conviction relief unless he produces a witness at his post-conviction evidentiary hearing who "could have been found by a reasonable investigation" and "would have testified favorably in support of his defense if called."  Id. at 758.  Without doing this, the petitioner cannot establish the prejudice requirement of the two-prong Strickland test.  Id.

The Petitioner failed to call Mr. Hogsett, Mr. Williams, or Ms. Jackson at the post-conviction hearing.  Because of this, the Petitioner cannot establish the prejudice requirement of the Strickland test.  We do not find ineffective assistance.

## CONCLUSION

Based upon the foregoing, the judgment of the trial court is affirmed.


_____
D. KELLY THOMAS, JR., JUDGE

-14-